**CONFIDENTIAL**

**An Evaluation of the 2020 Promotion to Police Lieutenant (Administrative),
Tredyffrin Township Police Department**

Joel P. Wiesen, Ph.D.
June 30, 2022

**Table of Contents**

1. Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 3

2. Qualifications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 3

3. Publications and Papers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

4. Court Appearances and Depositions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

5. Compensation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

6. Documents Reviewed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

7. Overview of the 2020 Promotion process for Lieutenant (Administrative). . . . . . . . . Page 5

8. Standards for Conducting a Structured Interview for Promotion. . . . . . . . . . . . . . . . Page 7

9. Promotion Process Is Not in Accordance with Professional Standards. . . . . . . . . . . . Page 8

10. Federal Standards for Rank Ordering. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 10

11. Many Weaknesses in the 2020 Promotion Process. . . . . . . . . . . . . . . . . . . . . . . . . . . Page 10

12. No Protections Against Subjectivity and Intentional or Unintentional Bias. . . . . . . . Page 12

13. Evaluation of the Promotion Decision Reasons Provided by TT. . . . . . . . . . . . . . . . . Page 13

14. The New Lieutenant and Captain Jobs May be Reversed. . . . . . . . . . . . . . . . . . . . . . Page 18

15. Possible Indication of Lack of Candor. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 19

16. Promotion process Violates Tredyffrin's Employee Promotion Policies. . . . . . . . . . . Page 19
    a. No weight given to educational achievement despite TT policy. . . . . . . . . . . . Page 19
    b. The TT Position Classification Plan Lacks Needed Job Descriptions. . . . . . . . Page 20

**CONFIDENTIAL**

    c. The Interviewers Did Not Include All the "Predetermined Members". . . . . . . Page 21
    d. The Chief Did Not Submit an Explanation of His Decision. . . . . . . . . . . . . . Page 21
    e. Past Job Performance Considered Inconsistently. . . . . . . . . . . . . . . . . . . . . . Page 21

17. Possible Indications of Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 21
    Table 1. Comparison of the Personnel Folders of Mr. Moyer and Ms. Major. . . . . . Page 24

18. Specific Indications of Gender Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 25

19. Summary of My Opinions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 26

Attachment A: Resume of Joel P. Wiesen, Ph.D.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 28

Attachment B: List of Papers and Publications. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 29

Attachment C: List of Documents Provided to Me by Counsel. . . . . . . . . . . . . . . . . . . . . . Page 31

Attachment D: Evaluating the Validity and Fairness of a Test. . . . . . . . . . . . . . . . . . . . . . Page 39
    A.  Federal and Professional Testing Guidelines, Standards, and Principles. . . Page 39
    B.  Accepted Approaches to Validating a Test. . . . . . . . . . . . . . . . . . . . . . . . . . Page 41
    C.  Description of Content Validation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 41

**CONFIDENTIAL**

**An Evaluation of the 2020 Promotion to Police Lieutenant (Administrative),
Tredyffrin Township Police Department**

Joel P. Wiesen, Ph.D.
June 30, 2022

**1.   Overview**

I have been asked by counsel to review documents related to the selection of a person to promote in Tredyffrin Township (TT) and specifically a promotion to Lieutenant in the Tredyffrin Township Police Department (TTPD) in 2020, and to evaluate: (a) whether the promotion process[1] was designed and conducted in a professionally acceptable manner, (b) whether the design of the promotion process was of the type that minimizes or allows for the expression of subjectivity and the possibility of intentional or unintentional bias, (c) whether the promotion process used is consistent with published Tredyffrin policy, (d) whether there are any indications of possible bias in the promotion process, and (e) whether there were any other possible indications of gender bias in the materials I reviewed.

In short, I found that the promotion process used by the TTPD:

A.  Was not designed and conducted in a professionally acceptable manner.

B.  Lacked features typically used to minimize subjectivity and the possibility of intentional or unintentional bias.

C.  Did not comport with the published policies and procedures of the municipality of Tredyffrin, including those of the TTPD.

D.  Contains indications that many aspects of the promotion process were open to bias.

Further, I found:

E.  There are some indications of gender bias in the other materials I reviewed.

**2.   Qualifications**

In short, I have relevant academic degrees and professional credentials, and I have developed or collaborated on the development of numerous public safety promotional examinations for municipalities and departments of various sizes.

---

[1]Unless otherwise specified, I use the term "promotion process" below to refer to the process used by the TTPD to select a person to be promoted to Lieutenant in August of 2020. The TTPD has described this process as an "examination" and I agree with that description.

**CONFIDENTIAL**

I am the owner and Director of Applied Personnel Research, and an expert on employment testing and its ability to predict future job performance of employees. I was awarded a Ph.D. in psychology from Lehigh University in 1975. My major field of doctoral study was psychology and my minor field of study was psychometrics. Since 1975, I have worked in the area of psychology known as industrial psychology, particularly in the development of fair and valid personnel assessment methods and instruments for the assessment, selection and promotion of employees. I have taught college courses in industrial psychology, experimental methods, and statistics at the undergraduate and graduate levels. For over 15 years I worked for the Department of Personnel Administration, later called the Human Resources Division, of the Commonwealth of Massachusetts. I was hired to lead the program to validate all civil service examinations, and for some of my tenure I was in charge of all test development and validation. While working for the Commonwealth, I was also charged with developing two employee job performance evaluation systems: one for state managers (covering about 3,000 employees) and the other for non-managerial state employees (covering some 50,000 employees). Since I left the employ of the Commonwealth of Massachusetts, my professional work has consisted mainly of consulting to municipalities and large organizations on personnel assessment and selection matters, and developing new written tests for government, business/industry, and education. I have served as President of the International Personnel Management Association Assessment Council (IPMAAC), an organization of over 500 testing professionals, and as President of the New England Society for Applied Psychology (NESAP), a Boston-area association of applied psychologists. From 1989 to 2022 I served as a reviewer on the Program Committee for some twenty-five of the annual conferences of the Society for Industrial and Organizational Psychology, a national, professional group of several thousand members and for other professional conferences and for professional publications. I am approved by the American Psychological Association to sponsor continuing education for psychologists, providing licensed psychologists with continuing education credits that may be used to satisfy state requirements for license renewal and by the Human Resources Certification Institute to sponsor continuing education courses for human resource professionals. I have served as an expert in employment discrimination cases pertaining to race, age, and gender discrimination, a few of which have gone to trial. I have served as an expert consultant on testing matters for the Massachusetts Attorney General's Office, the Connecticut Department of Administrative Services, the Connecticut Attorney General's Office, the US Department of Justice, smaller governmental entities, and both large and small private sector organizations. My legal work has been for both defense and plaintiffs. I have lectured and published in the areas of personnel assessment, employment discrimination, and civil service examining. I am a published test author. I have made numerous presentations before professional groups, including several invited addresses. I am licensed as a psychologist in the states of New York, Massachusetts, and Pennsylvania. A copy of my resume is attached to this report (see Attachment A).

**CONFIDENTIAL**

3. **Publications and Papers**
   In the past 10 years I have authored publications and presented papers at professional meetings, sometimes co-authored with others. A list of these publications and papers is presented in Attachment B.

4. **Court Appearances and Depositions**
   In the past four years I have testified in these three court cases:

   2018
   Orlando O. Riley v. Massachusetts Department of State Police
   United States District Court for the District of Massachusetts
   Civil Action No.: 1:15-CV-14137-DJC

   2020
   Connecticut State Police, et al. v. James Rovella, et al.
   Superior Court, Judicial District of Hartford
   Docket No. HHD-CV-19-6120210-S

   2022
   Lopez, et al. v. Commonwealth of Massachusetts, et al.
   Suffolk, SS. Superior Court Department
   Civil Action No. 09-0576-A

5. **Compensation**
   I am being compensated at my usual rate of $400 per hour for all time spent on this matter and at half that rate for travel time, plus out of pocket expenses billed at cost.

6. **Documents Reviewed**
   A list of the documents provided to me by counsel is provided in Attachment C. I have numbered these documents consecutively in the order in which I received them as follows: M1, M2, M3, etc. Below I refer to these documents using these numbers (e.g., M3 page 10).

   I reserve the right to revise my report when I receive other additional information the municipality may produce concerning this matter.

7. **Overview of the 2020 Promotion process for Lieutenant (Administrative)**
   I summarize here the major steps in the promotion process as I understand them. This summary is not evaluative. It is provided as background and context to my analyses and evaluations below.

**CONFIDENTIAL**

The five most central people are:
    Superintendent (AKA Chief) Beaty - one of the two interviewers
    Lieutenant (now Captain) Brown - the second interviewer
    Captain Glatts - his retirement triggered all the promotions
    Sergeant Michelle Major - the plaintiff
    Sergeant Tyler Moyer - the candidate who was promoted to Lieutenant

A memo from Chief Beaty was sent on July 7, 2020 describing planned staffing changes, saying that "Currently the Captain position oversees the administrative and detective functions of the department" and saying the person promoted to Captain would "retain authority of our patrol division with the six platoon sergeants reporting to him, as well as oversight of the newly appointed Lieutenant" and the new "Administrative Lieutenant" would have "direct oversight of the Detective Division, Traffic Safety Unit, Community Policing, and the civilian administrative staff".[2]

An announcement was promulgated on July 15, 2020 saying there would be an interview panel as part of an examination process for Lieutenant with the date(s) to be determined, with three raters including one rater from outside the TTPD.  A modification to the announcement was promulgated on July 28, 2020 saying that the outside rater would not be used.

The promotion process included one graded component: an oral interview.[3]  The oral interview consisted of six questions that were asked of all candidates, which I paraphrase as follows:
    Q1: Given the provided job description, describe your qualifications.  (Follow-up questions on the knowledges, skills, and abilities listed on the job description and the candidate's understanding of the position.)
    Q2: Describe an example of when you faced adversity.
    Q3: Describe a recent excellent decision at work. [Recent was not defined.]
    Q4: Describe your most important contributions to the PD in the last 3 years.
    Q5: How would your peers describe you?
    Q6: What would you do in the first 90 days with respect to problem solving, customer service initiatives, and improving PD performance? (Follow-up questions on current status of PD and vision for the future.)
The wording of the follow-up questions was not provided.

---

[2]M9, par 2

[3]This may be contrasted with an examination for Sergeant that included 3 weighted, graded components: a job knowledge test, an oral interview, and a review of past job performance. (Source: Brown deposition of 5/12/2022, page 49)

**CONFIDENTIAL**

The oral interview was administered to each of the candidates on the same day and the answers to the above questions were evaluated by the two interviewers, Chief Beaty and Lt. Brown (i.e., the interviewers were the raters).

No video or audio recordings were made of the interviews. Some handwritten notes made by the interviewers at the time are available. Each rater rated each candidate's responses to each of the six questions separately on a numeric scale. The highest possible score on each question was 20 points and, therefore, the highest possible total score was 120. Each rater calculated a final score on the interview for each candidate by totaling his ratings for each of the six questions. The actual range of final scores was from a low of 90 to a high of 104 on the 120 point scale. These scores correspond to a range from 75.0 to 86.67 on a 100 point scale. There were no written standards or grading criteria for the questions.

8.  **Standards for Conducting a Structured Interview for Promotion**
    There are generally accepted professional standards for conducting employment interviews for the sake of evaluating candidates for promotion from one job title to another. These standards try to ensure that all candidates have equal opportunities to provide information and are assessed accurately and consistently. Such interviews are often referred to as "structured interviews". In the public sector they are also often referred to as "oral boards". There are various resources available to appointing authorities to assist in conducting such structured interviews, such as: *Structured Interviews: A Practical Guide.*[4]

    The widely agreed upon, professionally accepted steps in developing and conducting a structured interview are:
    1.  Describe the job duties based on a systematic process
    2.  Determine the competencies required by the job
    3.  Develop questions to measure the competencies required by the job
    4.  Develop rating scales to evaluate candidates on the competencies required
    5.  Train the interviewers
    6.  Document the development process
    7.  Administer the structured interview in a standardized fashion to each candidate
    8.  Raters each take notes on each candidate's responses/behaviors
    9.  Raters each rate each candidate
    10. Determine a final rating for each candidate
    11. Document the interview process

    _____

    [4]Issued by the U.S. Office of Personnel Management, September 2008. Downloaded on June 27, 2022 from https://www.opm.gov/policy-data-oversight/assessment-and-selection/structured-interviews/guide.pdf

**CONFIDENTIAL**

In addition, several federal agencies have issued standards on employee selection procedures and there are two documents issued by four professional associations on the standards and principles for employee selection procedures. (See Attachment D.) These guidelines, standards, and principles are germane to the evaluation of the promotion process in question and I also rely on them when I use the phrase "professionally acceptable".

**9. Promotion Process Is Not in Accordance with Professional Standards**
In this section I evaluate the TTPD promotion process in question with respect to each of the accepted steps enumerated above.

1. Describe the job duties based on a systematic process
   The nature of the job of Lieutenant changed somewhat from the duties and responsibilities of the then incumbent to the administrative job that was planned for the new incumbent. The new job functions were described in general terms on an official Job Description. The new job description was arguably sufficient as a starting point in developing the rest of the promotion process.

2. Determine the competencies required by the job
   There was no list of the competencies required to perform the job planned for the new incumbent and there was no list of the competencies that would be evaluated by the oral interview. Therefore it is impossible to determine if the promotion process was valid for the intended purpose of identifying the most qualified candidate. Based on the questions asked; the knowledges, skills, and abilities listed on the Job Description; and the reasons TT gave for promoting Mr. Moyer, it appears that the scope of competencies evaluated was a narrow slice of all the competencies required to do the job and ignored most of the knowledges, skills, and abilities listed in the official Job Description.

3. Develop questions to measure the competencies required by the job
   There was no indication of what competencies the various questions were intended to evaluate. Therefore, it is impossible to determine whether the questions asked provided a way to measure the competencies intended to be measured. Also, the lack of clarity as to what was being evaluated by any question left the grading up to the subjective judgment of each of the raters. Follow-up questions (or standard follow-up questions) were asked for only two of the six interview questions and the wording of the follow up questions was not documented, so I cannot evaluate their suitability or validity.

4. Develop rating scales to evaluate candidates on the competencies required
   The single 20 point rating scale had no anchors that describe the content of an answer that would qualify for receiving a given number of points. There was no description of what was being rated for any question and no anchors on the 20 point scale. This left the grading completely up to the subjective judgment of each of the raters.

Page 8

**CONFIDENTIAL**

5.  Train the interviewers
    There was no training of the raters with respect to administering the interview and grading the candidates.

6.  Document the development process
    There was no documentation of the development process with respect to items 3, 4, and 5 above.

7.  Administer the structured interview in a standardized fashion to each candidate
    It appears that the candidates were given about the same amount of time to answer the questions. It is impossible for me to evaluate if the main questions and the follow up questions were presented in a standardized fashion to each candidate because there was no audio or video record of the interviews.

8.  Raters each take notes on each candidate's responses/behaviors
    The raters did take notes, but the notes were grossly inadequate. The nature and content of the notes were left up to each rater. The notes are only partially legible and seem to have no structure other than to be organized by question (usually). There is no systematic link between the notes and the competencies being rated. The notes often record impressions rather than the behavior that was observed, which is not professionally acceptable.

9.  Raters each rate each candidate
    This was done.

10. Determine a final rating for each candidate
    This was done.

11. Document the interview process
    There is minimal documentation of the interview process beyond the duration of each interview, some brief rater notes, and the numeric ratings given. Specifically, there is no audio or video documentation of the interview, and no documentation of the standards against which the candidates were being evaluated.

    The documents disclosed by the defendants in response to interrogatories asking for all documents describing and supporting the promotion process are, at best, incomplete and disjointed, falling far below the standards of documentation enunciated in the federal Uniform Guidelines on Employee Selection Procedures and professional standards.

    With respect to fairness, I note that any appeal of the process was made to the same persons who conducted the promotion process and made the promotion decision. That is hardly an appeal process that maximizes the likelihood of an objective review.

**CONFIDENTIAL**

In sum, the promotion interview has not been shown to measure the characteristics required to perform the job. There is no professionally acceptable support for claiming that the interview is job related.

10. **Federal Standards for Rank Ordering**

The federal *Uniform Guidelines on Employee Selection Procedures*[5] (hereafter referred to as the *Uniform Guidelines* or the *UGESP*) sets higher validation standards for employee selection procedures that are used to rank order candidates than tests which are used on a pass-fail basis.[6] Question 62 of the *Questions and Answers* on the *UGESP* states, in part:

Any conclusion that a content validated procedure is appropriate for ranking must rest on an inference that higher scores on the procedure are related to better job performance. The more closely and completely the selection procedure approximates the important work behaviors, the easier it is to make such an inference.

Since the questions on the promotion process in question do not systematically assess the 29 job duties, and do not measure the 6 knowledges listed on the Job Description, and have at best a haphazard relationship to the 9 skills and abilities listed on the Job Description, the exam does not meet the requirement of the *UGESP* concerning ranking.

11. **Many Weaknesses in the 2020 Promotion Process**

It is my professional opinion that the documentation the defendant has provided is not professionally acceptable support for a claim that the promotion process in question will predict job performance as a Lieutenant. To the contrary, the documentation indicates that the examination in question fails to evaluate the candidates with respect to many of the major job requirements. There is no professionally acceptable support for the inference that a candidate with a higher interview score would do the job better than a candidate with a lower interview score.

a. One interviewer testified that there was no system for assigning a number to a candidate's response.[7]

b. Captain Glatts described his approach to selecting candidates for promotion saying, "I would never, and I wouldn't expect anybody around me here to ever promote somebody or move somebody into a position that they weren't eligible for or capable of doing just

---

[5] 43 FR 38295, 38314, August 25, 1978.

[6] The *UGESP* may or may not be applicable to this promotion process. In any case the *UGESP* provides standards for the use of an employee selection procedure for ranking purposes.

[7] Brown Deposition, 5/12/2022, page 156

Page 10

**CONFIDENTIAL**

cause they're a buddy..."[8] I take this to mean that Captain Glatts did not attempt to promote the most qualified candidate but that he willingly succumbed to making promotions based on friendships as long at the person promoted was competent.  To the extent that this is the approach of the TTPD it undermines the claim that the promotion process is valid.

c. One of the raters, Lt. Brown (now Captain Brown), when asked about the Order 3-11 promotion policy replied "there really isn't much of one ... you got to be [in] good standing in the agency".[9]

d. The questions asked were NOT geared towards the Administrative Lieutenant job.  One interviewer said "No" when asked if the questions were "geared towards the administrative lieutenant position".[10]  All six questions asked were taken from the 2017 oral interview for the Patrol Lieutenant job.

e. One interviewer (Brown) testified that the goal in developing or choosing questions was to "generate conversation" with no mention of measuring the required knowledges, skills, and abilities.[11]

f. One interviewer (Brown) stated that there were no written goals for the interview and no discussion of the goals of the interview.[12]

g. The decision as to whom to promote was based on an ability that is easily learned (software) rather than, say, community policing abilities that are difficult to master and take much time to implement.[13]

---

[8]Tredyffrin Township Interview of Captain Glatts, September 23, 2020, page 7

[9]Tredyffrin Township Interview of Lieut Brown, September 22, 2020, page 4

[10]Tredyffrin Township Interview Transcript of Lieutenant Tim Brown, September 22, 2020, page 30

[11]Brown Deposition, 5/12/2022, page 145

[12]Brown Deposition, 5/12/2022, page 147

[13]Tredyffrin Township Interview Transcript of Lieutenant Tim Brown, September 22, 2020, page 30

**CONFIDENTIAL**

h.   Chief Beaty testified that although the plan was for the interviewers to review the candidates' job performance evaluations, that was not done.[14]

i.   The promotion process employed by TT does not meet the standards for validity in the federal *Uniform Guidelines on Employee Selection Procedures* or the *Standards for Educational and Psychological Tests* authored jointly by three professional organizations, and the *Principles for the Validation and Use of Personnel Selection Procedures* published by the Society for Industrial and Organizational Psychology. (These documents are discussed Attachment D.

**12.  No Protections Against Subjectivity and Intentional or Unintentional Bias**
There are several basic approaches known to and used by the testing profession to avoid or minimize subjectivity and intentional and unintentional bias in ratings.

a.   Specificity in what is being rated is key to minimizing subjectivity and unintentional bias.  To the extent that the competencies being rated are not specified, the opportunity is great for the expression of subjectivity and unintentional bias.  There was no description of the competencies being evaluated by each question.

b.   It is well accepted in the field of testing that rating scales should be used when making ratings.  The rating scale points can be described in at least two ways: with general descriptive terms or with behavioral anchors that describe responses that typify various scale values.  Neither approach was used in the promotion process in question.  This leaves the grading open to a maximum amount of subjectivity.

c.   Focusing the observations and notes on the specifics of what a candidate says rather than on evaluations or impressions of the candidate is another approach designed to minimize subjectivity and unintentional bias.  Concerning the interviews in question, many of the interviewer notes were conclusions rather than such observations.  For example, "odd inappropriate relationships", "lack of leadership understanding", "very moody", "good resume", and "very lazy".

d.   It is patently unfair for close friends to be both interviewer and interviewee, but that occurred in this promotion process.  Specifically, Lt. Brown was friends with the candidate Mr. Moyer, even serving as the best man at Mr. Moyer's wedding and recruiting him to work for the TTPD.[15]  Clearly, Lt. Brown should have reclused

---

[14]Beaty Deposition, May 19, 2022, page 165

[15]Tredyffrin Township Interview Transcript of Lieutenant Tim Brown, September 22, 2020, page 23

CONFIDENTIAL

himself from the interview process.  Chief Beaty seemed to be aware of this type of issue.  Chief Beaty gave professional, measured answers for almost the entire 15 page "Tredyffrin Township Interview Transcript of Superintendent Michael Beaty; September 23, 2020".  That changed when he was asked about the possibility of Lt Brown trying to help Mr. Moyer get promoted due to the Brown-Moyer friendship, at which point Chief Beaty switched to his only instance of profane language saying, "No, I'm going to fucking expand upon that Lieutenant Brown has been nothing but standup here since I've been here. He's done the job the right way ..."  It seems that this topic was a hot button for Chief Beaty.

Chief Beaty testified that in 2017 he decided not to invite Chief Behr to serve on the Lieutenant selection panel because of their close working relationship.[16]  So it is not clear to me why in 2020 he thought that Lt. Brown's close friendship with a candidate was acceptable.

e.  A promotion process that affords an appeal or review process that is heard by the same people who made the original ratings is an appeal process in name only, yet that is the only type of appeal afforded candidates in this promotion process (i.e., to the Chief[17]).

f.  Affording all candidates an equal opportunity to prepare for a promotion process is a basic aspect of fairness.  Mr. Moyer was provided with a higher level of access to some TTPD software than was provided to Ms. Major.[18]  Therefore, professional testing statements indicate that it was unfair to evaluate these two candidates on their knowledge of TTPD software as part of the promotion process.

g.  The selection criteria seemed to have been influenced by one individual candidate (Mr. Moyer's "plan" and his computer facility) than by a predetermined set of selection criteria.  (This is discussed further below.)

In summary, the design and implementation of the promotion process was of the type that allows for and even encourages subjectivity in rating and the possibility of intentional or unintentional bias.

13. **Evaluation of the Promotion Decision Reasons Provided by TT**
    The reasons provided for selecting Mr. Moyer appear illogical and manufactured.  The

---

[16]Beaty Deposition, 5/19/2022, page 129

[17]Order 3-11 26. b.

[18]Glatts Deposition, 5/12/2022, page 91

**CONFIDENTIAL**

memo of 7/15/2020 announcing the promotion process for Lieutenant states only one competency: "demonstrated leadership traits". The memo requests only a letter of interest describing "professional and personal accomplishments". That would lead to the expectation that the promotion would be based on an evaluation of leadership and accomplishments. But that was not the case. Leadership and accomplishments were not the focus of the reasons for promotion provided by the defendant. That lead me to consider carefully the reasons that were provided by TT for the promotion decision in this matter. The reasons provided by the defendant for the selection of Mr. Moyer are several and varied.

a.  One reason given for the selection of Mr. Moyer is that he "came prepared to the interview with an interdepartmental communication plan that he developed and proposed to implement."[19]  However, interdepartmental communication is not mentioned even once on the official Job Description issued in conjunction with this promotion process. Further, the two page, 268 word document submitted by Mr. Moyer, titled "Interdepartmental Information Exchange" was without any description of a plan of interdepartmental information exchange. Rather, it consists solely of very brief descriptions of police incidents at three addresses. This "plan" is so devoid of content that I can more readily see how it would be taken as an indication of incompetence than of special competence. This reason for promotion reeks of intentional bias.

That this plan had a minor impact on the interviews may be inferred by the fact that one of the interviewers (Brown), when shown a copy, did not recognize the "plan" that Boyer presented at the interview and that played such a large role in the selection process.[20]

Further, Chief Beaty testified that Ms. Major also talked about information exchange. He said that Ms. Major "brought it up as information sharing. She did a nice job on that."[21]

Finally, Chief Beaty testified that in the year and a half since Mr. Moyer's promotion, the brief plan reports have been issued only on a quarterly basis.[22]  It is not clear to me how a very brief quarterly report on a few specific incidents adds much to

---

[19]Letter of 12/8/2020 to the EEOC from Andrew Adair, page 5

[20]Brown Deposition, 5/12/2022, page 193-194

[21]Beaty Deposition, 5/19/2022, page 205-206

[22]Beaty Deposition, 5/19/2022, page 206

**CONFIDENTIAL**

interdepartmental communication, particularly because the reports were intended to improve communication between shifts.[23]

b. The reasons given for the promotion of Mr. Moyer indicate that his selection was based on his "understanding of the responsibilities" of the promotional position and his "creativity and technical aptitude to implement new ideas".[24]  The first interview question  asked, in part, about the candidate's understanding of the position, although this was not the central part of the question and the specific question(s) asked about the duties were not stated. The documentation of the interview questions says, in parentheses:

> "Follow up questions would be about the required knowledge, skills and abilities as listed on the job description and then what the candidate perceives the position to be."

The interview ratings of Mr. Moyer and Ms. Major were 19 and 18.5 on the first interview question, out of a possible 20 points.  These ratings correspond to 95 and 92.5 points out of 100.  The ratings of these two candidates were very close on the only question that measured understanding of the position.

Creativity is not listed among the Official[25] Job Description's lists of the six (6) required knowledges and of the nine (9) required skills and abilities.  There was no question that asked the candidates to relate examples of their creativity, but question three asked the candidates to describe "a recent time that you made an excellent decision at work, even though the situation was complex and difficult to read at the time."  On question three, both Mr. Moyer and Ms. Major received a rating of 15.5 out of 20 points, which corresponds to 77.5 points out of 100.  This rating was the next to lowest average question rating for these two candidates. Citing such a relatively low rating as a main reason[26] for promoting Mr. Moyer appears unbelievable, especially since Mr. Moyer and Ms. Major were tied on the one question that measures creativity (and measures it only indirectly).  Further, the list of Essential Job Functions only mentions assisting with new management techniques as the 13th of 29 essential duties. The first listed essential job function includes commanding the Community Policing staff.  Community policing is a particular strength of Ms. Major but that was not cited in the reasons given for promotion.

---

[23]Beaty Deposition, 5/19/2022, page 204

[24]Letter of 12/8/2020 to the EEOC from Andrew Adair, page 2

[25]Issued at the time the position opening was announced

[26]Letter of December 8, 2020 to the EEOC, page 2

Page 15

**CONFIDENTIAL**

Next, I comment on the "technical aptitude to implement new ideas". I do not know what is meant by this phrase. If technical aptitude and implementing new ideas relate to question four (on contributions to the PD in the last 3 years), I note that the two candidates were rated very similarly: 18 and 17.5 points out of 20, corresponding to 90 and 87.5 points out of 100. There was no interview question asking about technical knowledge or ability and technical knowledge or ability is not listed among the required knowledges, skills, and abilities on the official Job Description. For these reasons, it appears to me that technical knowledge or ability was not considered an important part of the job until the defendant had to produce reasons for selecting Mr. Moyer over Ms. Major.

Question six might have touched on implementing new ideas, but I did not see anything in the interview notes that evaluated implementation of new ideas, other than that Mr. Moyer presented a proposed plan. The copy of that "plan" that I was given does not deserve to be called a plan. It is simply a very brief description of each of three police incidents (at three different addressees).

Another reason put forth by the defendant for the promotion of Mr. Moyer is that he "demonstrated superior technological proficiency" concerning the AXON (body cam), PlanIt (scheduling software) and CODY (records management software). However, there are no questions that are designed to measure proficiency with this software. There were indications that Mr. Moyer's facility with this software was gained based on preferential access to the software. This preferential access is a serious challenge to the fairness of the promotion process. In any case, such facility seems not to be all that important based on five considerations. **First**, computer expertise is not included among the official[27] Job Description's lists of the six (6) required knowledges and the nine (9) required skills and abilities. **Second**, the "ability to use" statement on computer software is brief and does not mention these three software packages and does not mention superior technical proficiency software in general or any specific software. **Third**, then Captain Glatts (now retired) thought facility with software was an unimportant part of the job of Lieutenant. At deposition, Captain Glatts was asked about the PlanIt software and he thought that software was of minor importance to the decision of whom to promote, as follows:

    14 Q. Did the facility of using the
    15 PlanIt program did that relate at all to
    16 becoming a lieutenant?
    17 A. I wouldn't think so. It's a

---

[27]Issued at the time the position opening was announced

Page 16

**CONFIDENTIAL**

18 scheduling software. It's really nothing.[28]

**Fourth,** the software vendors offer training on their software.[29]  With respect to the Axon body cam software, the Axon company offers[30] various training courses on its body worn cameras, including the use of the software.  Ms. Major's considerable academic credentials demonstrate that she is quite adept at learning and mastering new material.  **Fifth,** if facility in the use of software were a major consideration in selecting a candidate for promotion, I would have expected an interview question on the topic. Making a promotion decision based on a topic that was not probed in the interview seems strange.

c.  The reasons provided by TT for not selecting Ms. Major appear illogical
TT said that Ms. Major "did not come prepared with any significant new proposals to assist the administration of the Department."  To the contrary, in her answer to question six (on what the candidate would do in the first 90 days with respect to improving PD performance), Ms. Major proposed completing the TTPD policy manual as a way to improve the level of performance of the TTPD, an eminently logical recommendation.[31]  In her answer to question six, Ms. Major also recommenced de-escalation training, another eminently logical recommendation.  (Chief Beaty's notes say this approvingly about Ms. Major's de-escalation training recommendation: "She gets it.")  Lieutenant Brown's interview notes indicate that Ms. Major also raised the issue of the culture of the TTPD.  It is highly unusual for job applicants to write about dysfunctional aspects of the organization in their letters of application but that happened at the TTPD (as discussed below).  Given such comments in the letters of application, the culture of the TTPD seems to be an extremely important topic also.

d.  One rater explained that some of the high ratings for Mr. Moyer were due to his past job performance, saying, "...Sergeant Moyer's the one who kind of steps out and would always take the lead on so many things with getting certain things done..."[32]  This rater

---

[28]Glatts transcript, page 92

[29]Captain Brown was trained on PlanIt by the vendor (Deposition 5/12/2022, page 41)

[30]I found a number of third party training videos on the Axon body cam software on the web and the Axon company itself offers many training programs on its products.

[31]Indeed, Captain Brown testified that the TTPD is in the process of redoing the policy manual (deposition 5/12/2022, page 47).

[32] Tredyffrin Township Interview Transcript of Lieutenant Tim Brown, September 22, 2020, page 30

**CONFIDENTIAL**

deviated from the intended process and rated past job performance rather than the responses to the questions asked.

**14.  The New Lieutenant and Captain Jobs May be Reversed**

Lieutenant Brown supervised patrol and was then promoted to Captain where he will again supervise patrol.  (In the past, a Lieutenant supervised patrol and the position of Captain focused on higher level duties. Such duties are often described as administrative or managerial.)  In contrast, the new position of Lieutenant will focus on administrative duties, among other things.  Based on the job duty descriptions in the materials provided to me, it seems like the new Captain, Mr. Brown, will be doing much of the same work as was done when he was a Lieutenant.  In contrast, the new Lieutenant may be doing higher level administrative work.  Order 3-01, the Position Classification Plan, describes the duties of Administrative Lieutenant as having many budgetary and management functions, "The Lieutenant assigned to the Administration Division of the Police Department, is responsible for the overall functioning of the administrative component and all associated operations. Many general administrative functions are also the responsibility of the Administrative Lieutenant including budget (fiscal matters), event planning, departmental liaison functions, public records (acts as Deputy Open Records Officer), infection control officer and administration of township wide traffic safety planning and concerns."[33]  This responsibility seems to overlap with that of a Captain, "Many general administrative functions are also the responsibility of the Captain including budget (fiscal matters), personnel matters, event planning, departmental liaison functions, public records..."[34] Lt Brown remarked on this saying, "So that's what we were interviewing for was somebody to take over essentially what the captain's duties were, but as a lieutenant so we're just kind of like flip flopping um in rank, so I would be the captain of patrol rather than lieutenant patrol and he would be lieutenant in administrations rather than the captain of administration."[35]  It may be that this somewhat illogical change in job duties was designed to create a better fit between Mr. Moyer and the job.

Despite the change in focus of the job of Lieutenant from patrol to administrative, the 2017 Job Description for Operations/Patrol Lieutenant is almost identical to that of the Administrative Lieutenant, for example both Job Descriptions contain reference to "formulation of police department budgets" and "defining, preparing, implementing, and evaluating new management techniques".  My understanding of the duties of the

---

[33] Bates Tredyffrin 0582

[34]Tredyffrin Township Police; Job Description Table; Sworn Positions, Rev 07-2017

[35]Tredyffrin Township Interview Transcript of Lieutenant Brown, September 22, 2020, page 13

**CONFIDENTIAL**

Administrative Lieutenant and the Captain are that of an outsider, so it is possible that my impression is not correct.

15. **Possible Indication of Lack of Candor**
The official TT position[36] is that the neutral interviewer was abandoned due to scheduling considerations related to COVID.[37]  However when Lieut Brown was asked about abandoning the neutral interviewer, the only consideration mentioned was the difficulty scheduling the interviews on a day when none of the candidates would be on vacation.[38]  Chief Beaty testified that COVID concerns had no impact on the abandoning the neutral rater.[39]  In the end, all candidates were interviewed on one day.

16. **Promotion process Violates Tredyffrin's Employee Promotion Policies**
The documentation I reviewed reveals several serious deviations from the TT and TTPD's stated policies and procedures for promotion of employees.

   a. **No weight given to educational achievement despite TT policy**
   Chief Beaty described the factors he considered in making the promotion decision saying, " basically it's a cumulative it's a letter of interest, it's their resume we do a file review and we do the interview it's the totality of those circumstances all come together and we you know we look at what's the best fit for the agency at the time."  Chief Beaty did not mention educational attainment.

   TTPD written policy is that academic degrees are to be considered in the promotion process as clearly stated in TTPD Order 3-11 on Promotion:
   "24. Education to Be Considered
   The department recognizes the importance of promoting officer improvement and the improvement of the department through education. Consequently, officers obtaining associate, baccalaureate, masters or doctorate degrees, will be favorably recognized in the promotion process." (M3 page 10)

   This TTPD policy on education is consistent with the statement in the TT Employee Handbook (although I acknowledge reading material saying that the TT Employee

---

[36]Letter to the EEOC dated 12/8/2020, page 5

[37]Defendant, Tredyffrin Township's Answer to Plaintiff, Michelle Major's Amended Complaint with Affirmative Defenses, #24

[38] Tredyffrin Township Interview of Lt Brown; September 22, 2020, page 6

[39]Beaty Deposition, 5/19/2022, pages 167, 169

**CONFIDENTIAL**

Handbook does not apply to uninformed members of the TTPD):[40]
"Continuing education is a priority for managers and staff.  It is through a dedication to lifelong learning that employees continue to grow professionally and personally."
(Page 6)

This favorable recognition of education was not seen in the promotion in question.  The interview scores of Ms. Major and Mr. Moyer were very close, 104 and 100 out of a possible 120 points, corresponding to 86.7 and 83.3 points out of 100, or a difference of 3.3 points, and Ms. Major had considerably more education than Mr. Moyer, a Master's degree in strategic leadership (with distinction) and a Bachelor's degree in organizational leadership (summa cum laude) versus a Bachelor's degree for Mr. Moyer.  Despite TTPD's written policy to "favorably" recognize academic degrees, the promotion was given to Mr. Moyer.

It should be noted that interview ratings that differ by only 3.3 points for two candidates are very poor indicators that one candidate is better than the other.  This is true because of the low reliability of measurement of interview ratings.  If the same candidates were asked similar questions and rated by different interviewers, it is highly likely that the difference of 3.3 points would not be seen again.

**b. The TT Position Classification Plan Lacks Needed Job Descriptions**
The TT Position Classification Plan calls for current job descriptions for all police promotional job titles.  The stated purpose is "to aid in ... identifying the requirements of each position, establishing hiring criteria..."[41]  This is an accepted purpose for maintaining current job descriptions.  However, there is no job description for Police Captain or for the Lieutenant job that was to be filled by the promotion in question.  This lack makes it impossible for me to fully evaluate the appropriateness of some of the claims of the TT concerning the reasons for the promotion decision made.

TT claims that the computer facility of the promoted candidate was a main reason for the promotion decision.  The lack of a job description for Captain and Lieutenant makes it impossible for me to determine which rank requires this computer facility.  The record indicates that the departing Captain (Glatts) used the computer software in question.  That would indicate that such a facility is not an essential requirement for the new Lieutenant, especially not at time of promotion (since such facility can be learned).

---

[40]The Employee Handbook is part of the Personnel Rules and Regulations of Tredyffrin Township and is so labeled on the cover.

[41]TT Position Classification Plan, page 2

Page 20

**CONFIDENTIAL**

c. **The Interviewers Did Not Include All the "Predetermined Members"**
The TTPD Order 3-11 says that "Evaluations will be conducted by predetermined members of the promotion committee." However, in the current promotion process the one outside, neutral rater was eliminated from the interview team. This appears to be a violation of TTPD policy.

d. **The Chief Did Not Submit an Explanation of His Decision**
The TTPD Order 3-11 says that "The Superintendent of Police will submit a written explanation outlining the basis for his decision." However, the defendant has not produced such documentation for the current promotion process, indicating that no such statement exists. This appears to be a violation of TTPD policy.

e. **Past Job Performance Considered Inconsistently**
One of the raters said that when there was a tie, the raters relied on past job performance in making the promotion decision saying "if we had to change something up cause it was a tie across the board and we couldn't come up with a way to break that tie then we might need to bring in something else like a you know past practice past evaluations".[42]  However, the TTPD management claimed that past employee job performance evaluations were inexplicitly missing for all candidates but Ms. Major, so the interview panel did not consider any of the candidates' past employee job performance evaluations.[43]  That worked to the detriment of Ms. Major as her last performance evaluation was uniformly rated at the highest level.  Also, relying only on past job performance to break ties ignores (and violates) the TTPD policy on considering college degrees in making promotional decisions.

17. **Possible Indications of Bias**
In reviewing the documentation, I noticed a number of unusual aspects of the promotion process that are indications of bias and consistent with possible gender bias.[44]
a. The diplomas and certificates documenting Ms. Major's educational achievements were referred to by Captain Glatts as "wall art".[45]  This is an insulting, flippant way to describe significant educational achievements.  This comment is inconsistent with the

---

[42] Tredyffrin Township Interview Transcript of Lieutenant Tim Brown, September 22, 2020, page 29

[43]Beaty Deposition, 5/12/2022, page 120

[44]Some of these were mentioned above.

[45]As described by Major and confirmed by Glatts (M29, pages 5 and 46)

**CONFIDENTIAL**

statement in the TT Employee Handbook:[46]
"Continuing education is a priority for managers and staff.  It is through a dedication to lifelong learning that employees continue to grow professionally and personally."
(Page 6)

b.  The interviewers discussed the candidates before the interviews began.[47]

c.  The clearly stated, officially mandated "favorable" role of educational degrees in the promotion process was ignored as far as I could tell in the documentation provided by the defendant.

d.  One of the raters said that Mr. Moyer and Ms. Major were tied at the top of the group of candidates saying "Once you put the numbers together and I think um it was Sergeant Major and Sergeant Moore tied".[48]

e.  The reasons for selection of Mr. Moyer appear to be *post facto*.  The reasons for selecting Mr. Moyer focus on competencies that are not central to the promotional job and are not supported by the ratings on the oral interview or the interviewer notes (as far as I could tell) as described above.

f.  The decision to promote Mr. Moyer was ostensibly made because he had particularly competent understanding of some police department computer system(s).  But the required knowledges, skills, and abilities listed in the 2017 and 2020 job descriptions are word-for-word identical, showing that the two types of Lieutenant (Patrol and Administrative) require the same knowledge of PD computer systems.[49]  The job

---

[46]The Employee Handbook is part of the Personnel Rules and Regulations of Tredyffrin Township and is so labeled on the cover.

[47]Tredyffrin Township Interview of Lt Brown; September 22, 2020, page 7

[48]Tredyffrin Township Interview of Lt Brown; September 22, 2020, page 16

[49]This list of required knowledges, skills, and abilities is labeled "Minimum requirements of this position" but the TT Personnel Rules and Regulations describes the purpose of the job description saying "identifying the requirements of each position, establishing hiring criteria, setting standards for employee performance evaluations..."  Clear this goes beyond minimum qualifications.  Also, the first interview question included follow up questions on "the required knowledge, skills and abilities as listed on the job description".  Based on all this, I understand the word "minimum" in the heading on the job description to refer only to the first listed requirement of "Required education/experience/training".

**CONFIDENTIAL**

description for the Administrative Lieutenant was revised 7/15/2020 and has no additions to the computer KSA listed in 2017, so the emphasis on computer skills in making the promotion decision is odd.

g. Lt. Brown thought it was inappropriate for Ms. Major to bring up her first marriage when answering a question about facing adversity.[50] However the instructions to the candidates said to provide "A letter of interest for the position elaborating on professional and personal accomplishments relevant to the position of lieutenant".[51] This acceptance of personal information concerning accomplishments might reasonably have led a candidate to think about personal accomplishments when answering the question on adversity.

h. Mr. Moyer was promoted because he had computer skills that would be leaving the PD with the retirement of Captain Glatts. I wanted to check the Job Description for Captain to see if these purported essential and demanding skills were listed there, but there is no job description for Captain in the Position Classification Plan. In any case, the retiring Captain said that the function of the "PlanIt" software is "just scheduling" and facility with this software is not an important part of the job of Lieutenant. Chief Beaty said that all that was needed to use the PlanIt scheduling software is a "basic lesson".[52]

i. The statement of the Chief that "Outside letters of recommendation are not necessary"[53] may be viewed in light of Ms. Major's unique standing in the community. In the 2017 promotion process for Lieutenant, letters of reference were submitted in support of the candidacy of Ms. Major. Ms. Major's personnel file contains some 180 letters of commendation from the community authored by civilian individuals and organizations, and 80 pages related to letters of commendation from within the TTPD. Mr. Moyer's personnel file, in contrast, contains only 10 pages related to community commendation and 27 pages related to letters of commendation from within the TTPD. Given the focus of most police departments on good community relations, and in light of General Order 1.5.1 which lists the benefit of "better community relations", it is surprising that the Chief decided not to consider letters of recommendation. (See Table 1.)

---

[50]Tredyffrin Township Interview of Lt. Brown; September 22, 2020, page 11

[51]Memo of July 15, 2020 announcing the 2020 Lieutenant promotion process

[52]Beaty Deposition, 5/12/2022, page 57

[53]Deposition of T Brown on May 12, 2022, page 111

**CONFIDENTIAL**

j.  Although Chief Beaty Chief Beaty did a file review for accolades and negatives,[54] apparently he did not notice or ignored the huge differences in the personnel files of Mr. Moyer and Ms. Major.  In addition to the large difference in letters of reference as just described, Mr. Moyer's personnel file contains about 140 training certificates as compared to over 180 for Ms. Major.  (See Table 1.)

| Table 1. Comparison of the Personnel Folders of Mr. Moyer and Ms. Major | | |
|---|---|---|
| Type of Content | Mr. Moyer | Ms. Major |
| Official citations | 5 | 11 |
| Recommendations or commendations by TTPD superior officers | 22 | 70 |
| Letters of commendation by civilians individuals and organizations | 10 | 181 |
| Training certificates | 140 | 180 |

k.  The (nominally annual) 2019 TTPD Employee Development Report for Ms. Major, dated 1/24/2020, was glowing, with no rating less than the highest rating possible.  It is surprising that this official record of past job performance was not considered despite the professionally accepted view that past job performance can be the best predictor of future job performance.  There is a possibility that the decision to not consider past job performance was due to the recent superlative evaluation for Ms. Major.

l.  There are several strong indications of non-professional interactions at the TTPD.  A recently retired Detective recently said, "there is a culture in the department of playing favorites. The favorites always get opportunities for training and promotion. It is a bit of a good old boy's club, and there are not any women in the favorites club."[55] A female Police Officer said, "Yes. It used to be a good old boys club, but it is no longer that. All of those people are gone."  In his letter of application dated 7/21/2020, Sergeant Dori said " I am concerned that our department is a little too fragmented currently. We need to get everyone on the same page and working towards a common goal."  An applicant for Lieutenant in 2017 wrote, "...jealously, which I believe is the biggest reason for

---

[54]Beaty Deposition, 5/12/2022, page 121

[55]EEOC Witness Interview Summary of R Bostick, 2/25/2021

Page 24

**CONFIDENTIAL**

some of our internal strife."[56]  This same applicant wrote in this letter of application, "It's now routine that many supervisors are spending parts of their work day managing personal businesses, teaching, coaching, politicking or focusing their attention on things that build their resume. That practice has increased and it has caused absent management."  It is highly unusual for an internal applicant applying for promotion to talk about dysfunctional aspects of the organization. Clearly there are or were some serious issues concerning the TTPD.

m.  That the 2020 interview process was 6 questions, as compared to the 9 questions in the 2017 Lieutenant promotion process, could be a result of a pre-ordained outcome of the 2020 promotion process.  (Why spend time when the outcome is pre-ordained?)

n.  There were no grading criteria for the questions asked.  In fact, Chief Beaty could not tell why he gave specific grades even after looking at his interview notes.[57]

o.  Fully half of the 3.33 point difference in interview rating (on a 100 point scale) between Mr. Moyer and Ms. Major was due to question 5 which asked about what the candidate thought their peers would say about them, a highly subjective question with no stated grading criteria.  The follow up to question 5 seems unrelated to the main question. The follow up concerned the candidate's "perception of accountability. Not just within the department, but with you as well."  The lack of grading criteria for this follow up question (and for all questions) makes it impossible for me to evaluate the criteria applied in rating the responses to this follow-up question.  In any case, that the greatest difference between candidates Mr. Moyer and Ms. Major was due to this very subjectively graded question raises the possibility of unconscious or conscious bias.

p.  Both of the raters thought no special steps (e.g., a neutral outside rater) were necessary to assure fairness in exam because they were certain they themselves were fair.[58,59]

**18. Specific Indications of Gender Bias**
In reviewing the documentation provided by the defendant, I noticed some clear indications of gender bias in the TTPD.  These are summarized next.

---

[56]Tredyffrin 0104

[57]Beaty Deposition, 5/19/2022, page 199

[58]Brown Deposition 5/12/2022, pages 124-125

[59]Beaty Deposition 5/19/2022, page 182

**CONFIDENTIAL**

a. An all-male, "good ole boy's club" at the TTPD was described by recently a retired Detective who worked at the TTPD for 20+ years.[60]

b. Captain Brown heard the term good ole boys club used at TTPD and has used the term himself.[61]

c. Captain Glatts testified that the term good ole boys club has been used at the TTPD for years for a group of people who work together.[62]

d. Captain Glatts referred to female police officers as girls when he discussed range training, "when it comes to the girls like there's six" and "there's other range instructors there to you know get the girls together and train them up a little bit".[63][64]

e. Captain Glatts testified that he referred to several female TT HR managers as girls.[65]

f. One female Sergeant reported that she experienced discrimination in the TTPD after her promotion to Corporal when some patrol officers said she was promoted because she is female.

19. **Summary of My Opinions**
A brief summary of my opinions is provided below. My opinions are based on my review of the documents I received from counsel. I reserve the right to amend this report if and when I receive additional information.

My opinions may be summarized as follows. Based on my review of the materials made available to me, it is my professional opinion to a reasonable degree of scientific certainty that the 2020 TTPD Lieutenant promotion process:

---

[60] EEOC Witness Interview Summary of R Bostick, 2/25/2021

[61] Deposition 5/12/2022, pages 82, 84

[62] Glatts Deposition, 5/12/2022, page 53

[63] Tredyffrin Township Interview of Captain Glatts; September 23, 2020, page 9

[64] Tredyffrin Township Interview Transcript of Sergeant Stephanie Bills, September 25, 2020, page 4

[65] Glatts Deposition, 5/12/2022, pg 44

**CONFIDENTIAL**

A. Was not demonstrated to be job-related and was not conducted in a manner that comports with professional standards.  Further, there is no professionally acceptable reason to believe that a person who passes the exam is qualified to be a Lieutenant or that the person who was promoted was the best candidate.

B. Lacked measurement features typically used to minimize subjectivity and the possibility of intentional or unintentional bias in the ratings.  The interview was graded in a fashion known to be maximally open to subjectivity and intentional and unintentional bias.

C. Was not conducted in a manner consistent with the published policies and procedures of the municipality of Tredyffrin, including those of the TTPD.

D. Contains indications that many aspects of the promotion process were open to bias and any of these might have allowed gender bias to affect the promotion decision.

Further, I found:

E. There are some clear indications of gender bias in the non-promotion process materials I reviewed.

I consider the 2020 promotion process to be a professionally unacceptable approach to use to select a Police Lieutenant.

Joel P. Wiesen
June 30, 2022

**CONFIDENTIAL**

**Attachment A: Resume of Joel P. Wiesen, Ph.D.**

**JOEL P. WIESEN, PH.D.**
62 Candlewood Road • Scarsdale, NY 10583 • (617) 244-8859
http://linkedin.com/in/joelwiesen
jwiesen@appliedpersonnelresearch.com

### PROFESSIONAL PROFILE

Industrial psychologist with considerable experience in test development, test validation, evaluation of fairness in employment decisions, statistical analysis, and expert witness services in employment discrimination cases. Licensed as a psychologist in three states (MA, NY, and PA). Certificate of Professional Qualification in Psychology (CPQ) from the Association of State and Provincial Psychology Boards.

### EMPLOYMENT HISTORY

**Consultant in Industrial Psychology**; Newton, MA and Scarsdale, NY (full time since Jan. 1994)   **1977-Present**
- Consult to public and private organizations, primarily in the areas of employee assessment, selection, and layoff
- Develop tests of knowledge, ability, aptitude, and work-style
- Develop home-study, continuing education courses for psychologists
- Conduct statistical and content analyses of fairness and adverse impact in employment settings
- Provide expert witness services to defendants and plaintiffs in employment discrimination cases

**Director of Test Development and Validation** (part time from 1987-1993)   **1977-1993**
**Massachusetts Department of Personnel Administration**; Boston, MA
- Develop, implement, and evaluate employee selection, promotion, and job performance evaluation tools and programs
- Conduct applied research concerning civil service employment in Massachusetts
- Provide expert witness services on behalf of the Commonwealth of Massachusetts

**Research Associate; Applied Psychological Services, Inc.**; Wayne, PA   **1975-1977**
- Originate, design, conduct, and report applied psychological research in areas such as job sample performance tests and assessment centers
- Conduct literature reviews
- Serve as in-house statistical consultant

### TEACHING EXPERIENCE

| | |
|---|---|
| **Baruch College**, City University of NY Department of Statistics and Computer Information Systems; Adjunct Faculty, Spring 2012 | **Northeastern University**; Boston; School of Engineering Engineering Management Program; Lecturer, 1978-1994 |
| **Lesley College**; Cambridge, MA School of Management; Adjunct Faculty, 1989-1994 | **Kings College**; Wilkes Barre, PA ; Assistant Professor, Acting Department Chair, Department of Psychology, 1969-1975 |

### EDUCATION

Ph.D., Psychology (minor in statistics/psychometrics), Lehigh University, 1975
M.A., Psychology, C. W. Post College of Long Island University, 1969
B.A., Psychology, Stony Brook State University, 1967

### PROFESSIONAL ASSOCIATION MEMBERSHIPS AND HONORS

International Personnel Assessment Council, American Psychological Association, Association for Psychological Science, International Public Management Association for Human Resources, Metropolitan New York Association of Applied Psychology, Society of Industrial and Organizational Psychology, American Statistical Association. *Past-President, IPMA-Assessment Council; Past-President, New England Society for Applied Psychology.*

### PROFESSIONAL ACCOMPLISHMENTS

Plan, develop, and implement employee assessment and selection programs to achieve excellence and fairness in human resource management: develop culturally fair and valid employee selection and promotion tests and systems; conduct validation research and statistical analyses; develop test of mechanical ability and other tests used in industry; develop continuing education courses for psychologists, develop diagnostic math tests for use in school settings; and publish/deliver reports and papers at professional conferences.

**CONFIDENTIAL**

**Attachment B: List of Papers and Publications**

(2014) *NYC's Firefighter Exams in Federal Court, as Seen by One of the Plaintiffs' Experts*.  An invited presentation to the Personnel Testing Council of Metropolitan Washington, Arlington, VA.

(2014) *Expert Witness 101*.  International Personnel Assessment Council Annual Conference, Denver CO.

(2015) *Unexpected Contamination of Criterion Data by Economic Pressures*
International Personnel Assessment Council Annual Conference, Atlanta, GA.

(2015) *Being an Expert Witness: Beyond the Basics*
International Personnel Assessment Council Annual Conference, Atlanta, GA.

(2015) *Test Construction Guidance in the New (2014) Testing Standards*. International Personnel Assessment Council Annual Conference, Atlanta, GA.

(2016) *Smith v Boston (2015); The Decision and an Insider's View*. International Personnel Assessment Council Annual Conference, Sacramento, CA.

(2017) *Quantitative Considerations in Balancing Validity, Utility, Fairness, and Adverse Impact*.  International Personnel Assessment Council Annual Conference, Birmingham, AL.

(2017) *Tools to Increase Diversity and Validity in Hiring Police Officers*.  International Chiefs of Police Association Annual Conference, Philadelphia, PA.

(2018) *Master Tutorial: Tools to Increase Diversity, Utility, and Validity in Hiring Police Officers*.  Annual Convention of the Society for Industrial and Organizational Psychology, Minneapolis, MN.

(2018) *The Uniform Guidelines: Love Them, Leave Them, or Work to Change Them?*
(One of 4 panelists).  International Personnel Assessment Council Annual Conference, Alexandria, VA.

(2019) *The New (2018) SIOP Principles: Content, History, Perspective*.  International Personnel Assessment Council Annual Conference, Minneapolis, MN.

(2019) *Tools to Hire Qualified Minority Police Officers*.  International Personnel Assessment Council Annual Conference, Minneapolis, MN.

**CONFIDENTIAL**

(2020)  I/O *Community Call #3; Enough is Enough: Addressing Systemic Issues in Law Enforcement Workplaces* (One of 6 panelists).   Zoom program organized by Black I/O Psychologists.

(2021)  *BARS Rater-Reliability: Levels and Implications* (In a symposium titled "BARS: Evaluation, Examples, and Innovations").  International Personnel Assessment Council Annual Conference, remote.

(2021) *Select Tests Based on Utility to Maintain Job Performance and Reduce Adverse Impact.*  International Personnel Assessment Council Annual Conference, remote.

(2021)  *Employee Promotion Process by Non-Psychometricians: An Actual (Absurd) Case Study.*  International Personnel Assessment Council Annual Conference, remote.

(2021)  *Reinvisioning Entry Level and Promotional Selection to Improve Both Diversity and Job Performance.*  Annual Conference of the Society for Police and Criminal Psychology, remote.

(2021)  *Industrial Psychology Approaches to Improve Supervision and Officer Performance Evaluation.*  Annual Conference of the Society for Police and Criminal Psychology, remote.

(2021)  *Effective Psychometric and Administrative Approaches to Maximize Diversity in Hiring Police Officers.*  Annual Conference of the New York State Psychological Association, remote.

**CONFIDENTIAL**

**Attachment C: List of Documents Provided to Me by Counsel**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M1 | 6/3/2021 | 10-15-2020 Michelle Major EEOC Complaint.pdf | Charge of Discrimination 10/14/2020 |
| M2 | 6/3/2021 | 12-8-2020 Tredyffrin Twp EEOC position statement re MMajor, received on 1-6-21.pdf | Letter to Bridget Lange of EEOC from ANDREW B. ADAIR of 12/8/2020 |
| M3 | 6/3/2021 | Exhibits 1, 3-5, and 7 to 12-8-2020 Tredyffrin Twp EEOC position statement re Michelle Major.pdf | Exhibit 1 (no date) |
| M4 | 3/30/2022 | 12-8-2020 AAdair EEOC Position SMT re Michelle Major v. Tredyffrin Twp.pdf | Letter to Bridget Lange of EEOC from ANDREW B. ADAIR of 12/8/2020 |
| M5 | 3/30/2022 | 2-2-22 MMajor Amended Complaint.pdf | Amended Complaint Filed 02/02/22 |
| M6 | 3/30/2022 | 2-16-22 Tredyffrin Answer to MMajor Amended Complaint.pdf | Defendant, Tredyffrin Township's Answer to Plaintiff, Michelle Major's Amended Complaint with Affirmative Defenses |

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M7 | 3/30/2022 | 2017 MMajor - Lt application docs.pdf | Email<br>From: Mike Beaty<br>Sent: 9/21/2017<br>To: Brian Hughes; Edward Spitler; Joseph Glatts; Kevin Moore; Michelle Major; Mike Beaty; Ryan Scott; Timothy Brown; Todd Bereda; Tyler Moyer<br>Subject: Patrol Lieutenant Posting |
| M8 | 3/30/2022 | 2020 Tredyffrin Twp Police Dept Annual Report.pdf | 2020 Annual Report of PD |
| M9 | 3/30/2022 | 7-7-2020 Chief Beaty Memo.pdf | Memo<br>TO: BOS Personnel Committee<br>FROM: Chief Mike Beaty<br>DATE: July 7, 2020<br>SUBJECT: PD Staffing Updates Meeting Request |

CONFIDENTIAL

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M10 | 3/30/2022 | 9-15-2020 MMajor internal gender discrim complaint.pdf | Email<br>From: Michelle Major <Mmajor@tredyffrin.org><br>Sent: Tuesday, September 15, 2020 7:25 AM<br>To: Murph Wysocki <MWysocki@tredyffrin.org>; Mark Freed <MFreed@tredyffrin.org>; Matt Holt <rnholt@tredyffrin.orp; Sharon Humble <shumble@tredyffrin.orp; Julie Gosse <Gosse@tredyffrin.org>; Kevin ONell <konell@treclyffrin.org>; William Martin <WMartin@tredyffrin.org>., Casey Sands <csands@tredyffrin.org>; Mike Beaty <mbeaty@tredyffrin.org>; Joseph Glatts <JGlatts@tredyffrin.org>; Timothy Brown <tbrown@tredyffrin.org>; KS Bhaskar <bhaskar@tredyffrin.org><br>Cc: Michelle Major <Mmajor@tredyffrin.org><br>Subject: Gender Discrimination Complaint |
| M11 | 3/30/2022 | 9-22-2020 recorded interview of MMajor by atty Paul Della Franco.pdf | Tredyffrin Township Interview of Sergeant Michele Major<br>September 22, 2020 |
| M12 | 3/30/2022 | EEOC Witness Interviews RBostick, SAcker.pdf | EEOC<br>EEOC Witness Interview Summary<br>Witness Interviewed: Rob Bostick<br>Contact: (610) 662-6926<br>Date: February 25, 2021<br>Relevant Case: 530-2021-00266 |
| M13 | 3/30/2022 | MMajor Oct 2020 EEOC Complaint.pdf | Charge of Discrimination<br>10/14/2020 |
| M14 | 3/30/2022 | Officers Letters of Interest .pdf | Letters of application for Lieut Position |

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M15 | 3/30/2022 | Tredyffrin Twp Police Dept Org Chart.pdf | Tredyffrin Twp Police Dept Org Chart |
| M16 | 5/4/2022 | 7-24-2020 JGlatts email to MBeaty, cc to TBrown re letters and resumes for 5 candidates for Lt promotion.pdf | Email From: Mike Beaty To: Mark Freed Subject: FW: Lieutenant Posting 2020-CONFIDENTIAL Date: Wednesday, July 29, 2020 3:20:16 PM |
| M17 | 5/4/2022 | 7-28-2020 MBeaty Staffing Update, RBostick passed on Sgt promotion so female SBills promoted.pdf | Email From: Mike Beaty To: Murph Wysocki; Kevin ONell; Julie Gosse Cc: William Martin; Joseph DiRocco; Casey Sands; Timothy Brown; Joseph Glatts Subject: FW: Police Department Staffing Updates Date: Tuesday, July 28, 2020 1:44:07 PM |
| M18 | 5/4/2022 | 9-15-2020 emails with Tredyffrin Twp Bd of Supervisors, immediate reaction to MMajor's 9-15 gender discrim complaint.pdf | Email From: William Martin To: Murph Wysocki; Julie Gosse Cc: Kevin ONell; Casey Sands; Pat Harvey (pharvey@cdblaw.com) Subject: Re: Gender Discrimination Complaint Date: Tuesday, September 15, 2020 8:28:17 AM |
| M19 | 5/4/2022 | 9-26-19 MBeaty Memo re Sgt and Cpl promotion process.pdf | Memo To: All Personnel From: Chief Mike Beaty Date: September 26, 2019 Subject: Sergeant and Corporal Promotional Process |
| M20 | 5/4/2022 | Docs related to 2017 Lt promotion at Tredyffrin Twp Police Dept.pdf | Notice Tredyffrin Township Police Department October 20, 2017 All Personnel |

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M21 | 5/4/2022 | Document used by Tyler Moyer in his 8-12-2020 interview for Lt. at Tredyffrint Twp Police Dept.pdf | Tredyffrin Township Police Department Departmental Information Exchange August 12th, 2020 |
| M22 | 5/4/2022 | Handwritten notes by MBeaty and TBrown from Aug 2020 Lt promotion interviews.pdf | Handwritten notes by MBeaty and TBrown from Aug 2020 Lt promotion interviews |
| M23 | 5/4/2022 | Interview questions, job description - Summer 2020 Tredyffrin Twp Police Dept, Lt promotion.pdf | Tredyffrin Township Police Department Wednesday August 12, 2020 Patrol Lieutenant Interviews |
| M24 | 5/4/2022 | July 2009 Perf Eval for MMajor.pdf | Tredyffrin Township Police Department Police Officer Performance Evaluation Employee: Cpl Major Evaluator: Sgt Brown Date of Evaluation 7/25/09 |
| M25 | 5/4/2022 | July 2020 emails btwn Police Chief MBeaty and Tredyffrin Twp Bd of Supervisors re staffing updates.pdf | Email From: Kevin ONell To: Matt Holt Subject: Re: Staffing Updates Date: Friday, July 17, 2020 1:29:16 PM |
| M26 | 5/4/2022 | May 2015 Tredyffrin Twp Employee Handbook.pdf | Personnel Rules and Regulations Tredyffrin Township Chester County May 11, 2015 |

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M27 | 5/4/2022 | MMajor Awards and Kudos, Certifications, and Training - 463 pages.pdf | Major file: Awards, Kudos, Certifications, and Training Documents |
| M28 | 5/4/2022 | Position Classification Plan, revised March 2009, 98 pages.pdf | Order 3-01 Position Classification Plan |
| M29 | 5/4/2022 | Sept 2020 Interviews of MMajor, JGlatts, TBrown, Stephanie Bills, and MBeaty, interviewed by atty-investigator.pdf | Tredyffrin Township Interview of Sergeant Michele Major September 22, 2020 |
| M30 | 5/4/2022 | Sept 2021 selection, hiring and training of personnel policy.pdf | Tredyffrin Township Police Department Berwyn, Pennsylvania General Order 1.5.1 Subject: Selection, Hiring, and Training of Personnel September 21, 2021 |
| M31 | 5/4/2022 | TMoyer Certifications and Training, 204 pages.pdf | TMoyer Certification and Training Documents |
| M32 | 5/4/2022 | Tredyffrin Twp Supplemental Resp to MMajor's 1st Rogs, 04-01-22.pdf | Defendant, Tredyffrin Township's Supplemental Responses to Plaintiff's First Set of Interrogatories 04-01-22.pdf |
| M33 | 5/6/2022 | 2019 EE Development Report for MMajor, 4 pages.pdf | Tredyffrin Township Police Department Employee Development Report Sgt Major Evaluation Period 1/01/2019 to 12/15/2019 |

Page 36

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M34 | 5/16/2022 | Handwritten notes by MBeaty and TBrown from Aug 2020 Lt promotion interviews.pdf | Handwritten notes by MBeaty and TBrown from Aug 2020 Lt promotion interviews |
| M35 | 5/20/2022 | 2022-05-19-Zanaras-16359-Beaty_T-File_3_of_3 (3-4).mp4 | Video of Beaty Deposition (file 1 of 3) |
| M36 | 5/25/2022 | 051222 Brown._cond_N.pdf | Deposition Transcript Brown |
| M37 | 051222 GLATTS _cond_N. pdf | Deposition Transcript Glatts | |
| M38 | 5/25/2022 | 051322 BROWN AND GLATTS - Google Drive.mp4 | Videos of Depositions of Brown and Glatts May 12, 2022 |
| M39 | Lt., Administr ative July 2020 job descriptio n.pdf | Lt., Administrative July 2020 job description | |
| M40 | 5/25/2022 | Lt., Operations-Patrol July 2017 job description.pdf | Lt., Operations-Patrol July 2017 job description |
| M41 | 6/1/2022 | 349942.c01 mini.pdf | Transcript of Michelle Major's 5/10/22 deposition |
| M42 | 6/1/2022 | 051922 BEATY_cond_N.pdf | Transcript of Chief Beaty's 5/19/22 deposition |

**CONFIDENTIAL**

| JPW ID # | Date Rec'd | File Name | Title (from document, or first line or description if no title) Date (if dated) |
|---|---|---|---|
| M43 | 6/1/2022 | 2022-05-19-Zanaras-16356-Beaty_T-File_1_of_3.mp4 | Video of Beaty Deposition (file 1 of 3) |
| M43 | 6/1/2022 | 2022-05-19-Zanaras-16356-Beaty_T-File_2_of_3-003.mp4 | Video of Beaty Deposition (file 2 of 3) |
| M44 | 6/16/2002 | PMD0075, MBeaty.wav | Audio of Chief Beaty's Sept 2020 interview about Major discrimination claim. |

**CONFIDENTIAL**

**Attachment D: Evaluating the Validity and Fairness of a Test**

For some 100 years, psychologists have studied tests[66] that are used for selecting employees, as well as tests of human abilities in general. Government and professional standards for testing have been issued over the years, and several approaches to developing tests and documenting and evaluating the validity of tests have been identified and described.

### A. Federal and Professional Testing Guidelines, Standards, and Principles

About 35 years ago, four federal enforcement agencies jointly issued guidelines on employee selection procedures (after seeking input from professional and other interested groups). In addition, two professional organizations of psychologists have published standards and guidelines for testing. Thus, there are three documents that are generally and widely used when developing and evaluating employee selection tests such as the BPD promotional exam for Lieutenant: The *Uniform Guidelines on Employee Selection Procedures*[67] (hereafter referred to as the *Uniform Guidelines* or the *UGESP*), the *Standards for Educational and Psychological Tests* (hereafter referred as the *APA Standards*[68]) published in 2014 and the *Principles for the Validation and Use of Personnel Selection Procedures* published in 2018 by the Society for Industrial and Organizational Psychology (SIOP) and hereafter referred to as the *SIOP Principles*.[69]

In 1978, the federal enforcement agencies for Title VII of the 1964 Civil Rights Act, as amended, issued the *Uniform Guidelines* that contains specific requirements for personnel selection procedures and tests that have an adverse impact on protected

---

[66]The word "test" may be broadly defined as a sample of an examinee's behavior that is obtained and scored using a standardized process. This includes multiple-choice tests, evaluations of education and experience, structured interviews, job simulations, minimum requirements for a job, and the like.

[67]43 FR 38295, 38314, August 25, 1978.

[68]Although now co-authored by three professional associations, the first editions were authored only by the American Psychological Association, and they are still commonly referred to as the *APA Standards* or the *Joint Standards*.

[69]The *SIOP Principles* intended "to specify established scientific findings and generally accepted professional practice in the field of personnel selection psychology in the choice, development, evaluation, and use of personnel selection procedures..." This document is a revision of an earlier, similar document published in 1987 and is intended to be consistent with the *APA Standards*.

**CONFIDENTIAL**

groups. Since the *Uniform Guidelines* was issued, public and private sector employers and the industrial psychologists and psychometricians who do work for them have generally attempted to comply with the validation and documentation requirements therein. The *Uniform Guidelines* states its purpose as follows:

> These guidelines incorporate a single set of principles which are designed to assist employers, labor organizations, employment agencies, and licensing and certification boards to comply with requirements of Federal law prohibiting employment practices which discriminate on grounds of race, color, religion, sex, and national origin. They are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results. However, all users are encouraged to use selection procedures which are valid, especially users operating under merit principles.[70]

In 2014 the American Psychological Association, together with two other nationwide professional organizations,[71] published the *APA Standards*, an authoritative work written "to promote the sound and ethical use of tests and to provide a basis for evaluating the quality of testing practices."[72] This comprehensive, 200-page document covers educational and psychological testing. Of particular relevance to this case are its chapters on test validity, test reliability, test development and revision, supporting documentation for tests, fairness in testing and test use, and testing in employment and credentialing. This document is a revision of an earlier, similar document published in 1985. A newer edition was published this year.

In 2014 the Society for Industrial and Organizational Psychology published the *SIOP Principles*, intended "to specify established scientific findings and generally accepted professional practice in the field of personnel selection psychology in the choice, development, evaluation, and use of personnel selection procedures..."[73] This document is a revision of an earlier, similar document published in 1987 and is intended to be consistent with the *APA Standards*.

---

[70]*Uniform Guidelines*, Section 3.1. Statement of Purpose.

[71]The National Council on Measurement in Education and the American Educational Research Association

[72]*APA Standards*, page 1, column 1.

[73]*SIOP Principles*, page 1.

**CONFIDENTIAL**

**B. Accepted Approaches to Validating a Test**

The *Uniform Guidelines*, the *APA Standards*, and the *SIOP Principles* recognize several types of evidence that can support the validity of a test for a specific use. According to the *APA Standards*, a test itself is not considered valid or invalid; rather it is the validity of a test for a specific use and a specific interpretation of the test scores that is evaluated. All three documents describe several sources of evidence that might be used to evaluate the validity of a test in a specific application. The most widely used approaches to the validation of tests used for personnel selection purposes are commonly referred to as: content validation, criterion-related validation, and construct validation. These approaches to validity are specific to a given test in a given application (e.g., an exam for promotion to Police Lieutenant in Boston). Another approach to validation that involves the use of data from other situations includes what is referred to as "validity generalization" or "transportability", depending on the number of such studies being relied upon. Since it is appropriate to the promotion process used by the TTPD, I describe just the content approach to validation below.[74]

**C. Description of Content Validation**

Evidence[75] of the content validity of a test[76] relies on an analysis of the relationship of what the test measures (the content of the test[77]) and the content of the job.[78] This analysis includes systematic data collection (usually at least a systematic study of the job duties, along with the abilities and other worker characteristics required to successfully perform the job duties) which is followed by a judgmental process involving choosing test modalities and developing test questions. For example, postal clerks or bank tellers might spend much of their work days making change for customers, and so a content valid personnel selection test for these jobs might reasonably include questions that involve making change. Any attempt to prove that a

---

[74]The other two approaches used to evaluate test validity typically entail research into the empirical relationship of test scores to some measure of job performance (typically referred to as the criterion), or to the other tests of the same ability.

[75]For example, as called for by the *Uniform Guidelines*, Sections 14B and 15B.

[76]As defined by the *APA Standards*, a test is "An evaluative device or procedure in which a systematic sample of a test taker's behavior in a specified domain is obtained and scored using a standardized process." (See page 224.) Both the M/C exam and the E&E ratings fit this definition of a test.

[77]Sometimes called the "content domain" of the test.

[78]Sometimes called the "job domain" or "work domain."

**CONFIDENTIAL**

test is content valid involves a judgment of the degree to which the content of the test agrees with the content of the job.  As the *Uniform Guidelines* states,

> ...a content validity study should consist of data showing that the content of the selection procedure is representative of important aspects of performance on the job for which the candidates are to be evaluated.[79]

Content validity is a form of applied social science research.  Content validation must be differentiated from what is often called "face validity".  Face validity is a superficial similarity between test and job content, which is unsupported by careful research.  The *SIOP Principles* make this clear, as follows:

> Procedures that appear more relevant or face valid to the organization may be more acceptable to the stakeholders than other procedures that relate to a less obvious construct regardless of any empirical evidence of validity. However, face validity is not an acceptable substitute for other forms of validity evidence as treated in the Principles.[80]

---

[79] *Uniform Guidelines*, 3.5 B

[80] *SIOP Principles*, Page 37.